United States District Court
Southern District of Texas
**ENTERED**
October 03, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHRISTOPHER  EUSTICE, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:15-CV-03180 |
| | § | |
| TEXAS A&M UNIVERSITY, *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>OPINION AND ORDER</u>

Pending in the above-referenced cause is Defendants Texas A&M University ("TAMU") and TAMU President Michael K. Young's ("Young") Motion to Dismiss. Doc. 8. Defendants file their motion pursuant to Federal Rules 12(b)(1) and 12(b)(6). Having considered the motion, response, and relevant law, the Court concludes that Defendants' motion should be granted for the reasons outlined below.

### I.  Background

In 2012, Plaintiff Christopher Eustice ("Eustice") began his college education at TAMU. Doc. 1 ¶ 6. Eustice experienced academic success during his first year, but in the fall of 2013, one of his professors, Dr. Yong-Joe Kim ("Kim"), accused him of cheating on an exam and gave him a failing grade. *Id.* ¶¶ 7–9. Eustice appealed the professor's decision, but alleges that he was denied a hearing appeal of any kind. *Id.* ¶¶ 12–13. Eustice further contends that despite his repeated attempts to obtain redress from TAMU administrators and the director of the Aggie Honor System Office ("AHSO"), his requests were denied, causing the failing grade to permanently remain on his transcript. *Id.* ¶¶ 14–15.

A year later, Eustice again ran afoul of the Aggie Code of Honor when he turned in a lab report four days late. *Id.* ¶ 16. Eustice alleges that he "accidentally turned in the wrong report"—

a mistake he later corrected. *Id.* However, because his professor, Dr. Maggard ("Maggard"), believed the report had been plagiarized from another student's work, Eustice originally received a grade of zero on the report. *Id.* ¶ 17. Maggard later reversed his decision and granted Eustice a letter-grade reduction instead. *Id.* ¶ 18. Nevertheless, Maggard submitted an allegation of plagiarism to the AHSO in regard to the incident. *Id.* ¶ 19.

In the fall of 2014, the AHSO conducted an investigation into Maggard's allegations, and the Honor Council held a separation hearing at which they determined that Eustice should be expelled. *Id.* ¶¶ 20, 23. Eustice contends that he was led to believe that (1) he had no role in the hearing, (2) he could not bring evidence or witnesses, and (3) Maggard's teaching assistant would be in attendance on his behalf—all of which were untrue and prejudiced him in the Council's outcome. *Id.* ¶¶ 21–23.

Eustice appealed the expulsion decision to the Honor Appeals Board, which ultimately amended the sanction to receiving an F for Maggard's course and a suspension from TAMU for two years. *Id.* ¶¶ 24, 30. Unmollified by the Appeals Board's decision, Eustice attempted to speak with the Dean of Student Life, but his request was denied. *Id.* ¶ 31. When Eustice responded by refusing to leave the waiting room, he was removed from the office by TAMU police officers. *Id.* ¶ 32. According to Eustice, a few days later he and his family were forcibly removed from his dorm, allegedly in retaliation for Eustice's actions in challenging his suspension. *Id.* ¶ 33.

Eustice also alleges that he has "Attention Deficit/Hyperactivity Disorder," ("ADHD") and was refused requested testing accommodations for this disability. *Id.* ¶ 43. He argues that TAMU was aware of his disability, but he makes no further allegations with regard to his ADHD or how it affected his suspension decision. *See* Doc. 1.

On October 29, 2015, Eustice filed suit against TAMU and Young alleging a Section 1983 violation of his due-process rights under the Fourteenth Amendment (Count I); violations of Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12150, (Count II); and damage to reputation (Count III). Doc. 1. He seeks injunctive relief, reimbursement for additional tuition, costs, and fees at LSU,[1] damages for the ADA violations, "lifetime economic damages caused by the necessity to transfer to an institution of lesser prestige," damages for the damage to his reputation, more than $1,000,000 for the constitutional violations, punitive damages, and attorney's fees. *Id.* ¶ 57. Defendants responded with the instant Motion to Dismiss. Doc. 8.

## II.  Legal Standard

### a.  12(b)(1)

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject-matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1). Federal courts are of limited jurisdiction, possessing only those powers conferred by the Constitution and Congress. *Halmekangas v. State Farm Fire & Cas. Co.*, 603 F.3d 290, 292 (5th Cir. 2010); *see also Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Accordingly, ensuring that a federal court has proper jurisdiction "is fundamental and necessary before touching the substantive claims of a lawsuit." *Arena v. Graybar Elec. Co., Inc.*, 669 F.3d 214, 223 (5th Cir. 2012). If the court lacks either the statutory or constitutional authority to adjudicate a claim, then the claim shall be dismissed. *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (citation omitted). The requirement that jurisdiction be established as a

---

[1] Eustice's complaint contains no reference to LSU until the damages section when he states that he is seeking reimbursement for "costs and fees at LSU." Doc. 1 ¶ 57a. Presumably, this is the school of "lesser prestige" that he refers he transferred to. *See* Doc. 1 ¶¶ 49, 57c.

threshold matter "spring[s] from the nature and limits of the judicial power of the United States" and is "inflexible and without exception." *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884). As a result, "[w]hen a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)).

"In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute." *Id.* (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). "Lack of subject-matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* (citing *Barrera–Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).

### b.  12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows the court to dismiss a claim that fails "to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss for failure to state a claim, the court must accept as true all well-pleaded facts in the complaint, and must view the allegations as a whole in the light most favorable to the non-movant. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). Although Federal Rule of Civil Procedure 8 mandates only that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief," this standard demands more than unadorned accusations, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. v. Twombly*, 550 U.S. 544, 555–57 (2007) (internal citations and quotation marks omitted). Thus, to survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570.

Facial plausibility is satisfied when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). Although "the plausibility standard is not akin to a 'probability requirement,'" there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to "draw on its judicial experience and common sense." *Id.* at 664–65.

### III. Analysis

#### a. Section 1983 official-capacity claims against TAMU and Young

Defendants begin their assault on Eustice's Original Complaint by asserting that neither TAMU nor Young in his official capacity are "persons" subject to liability under Section 1983. Doc. 8 at 16–17. Eustice does not respond to this argument. *See* Doc. 13.

"To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th

Cir. 2000)). Neither a State nor its officials acting in their official capacities are "persons" subject to suit under Section 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). As a state-funded state institution of higher education, TAMU is an arm of the state and, therefore, immune from suit. *Kimmel v. Tex. A&M Univ.*, 267 F. Supp. 2d 646, 652–53 (S.D. Tex. 2002), *rev'd sub nom. on other grounds*, *Scanlan*, 343 F.3d 533. Accordingly, Eustice's Section 1983 claims against TAMU must be dismissed.

Notwithstanding sovereign immunity, state officials in their official capacities are "persons" when sued for injunctive relief. *Will*, 491 U.S. at 71 & n.10 (citations omitted). However, even when the state official is the named defendant, a plaintiff may not seek "[r]elief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law." *Papasan v. Allain*, 478 U.S. 265, 278 (1986). As the Supreme Court has made clear:

> This is true if the relief is expressly denominated as damages. It is also true if the relief is tantamount to an award of damages for a past violation of federal law, even though styled as something else. On the other hand, relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury.

*Id.* (citations omitted). Accordingly, to determine whether claims against Young may proceed, the Court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Cantu Servs., Inc. v. Roberie*, 535 Fed. App'x 342, 344–45 (5th Cir. 2013) (unpublished) (quoting *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011)) (internal quotation marks omitted)). In other words, in order to satisfy *Ex parte Young*, Eustice must show that the allegedly unconstitutional acts "were not a 'one-time, past event' but an ongoing violation." *Id.* at 345. (quoting *S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 510 (6th Cir. 2008)).

Eustice alleges that Defendants have deprived him of a property interest—the effects of which are ongoing—because "[h]e is left burdened with additional student loans and related costs due [to] the costs of transferring to another university after his dismissal and other costs and expenses and the damage to his reputation." Doc. 1 ¶ 39. Eustice also purportedly seeks injunctive relief. Doc. 6 at ¶¶ 52–56. Nevertheless, as Defendants correctly note, he specifies none in his complaint. Doc. 8 at 36. He seeks only damages and no prospective relief for which an injunction could issue. *See* Doc. 1. Accordingly, his claims against Young in his official capacity must also be dismissed.

### b.  Section 1983 individual-capacity claims against Young

The next question the Court must address is whether Eustice has asserted any claims against Young in his individual capacity. Defendants argue that he does not for two reasons. First, Eustice never explicitly states that he is pursuing individual-capacity claims. Doc. 8 at 18. Second, he fails "to set forth any factual allegations that Young was personally involved in or took actions casually connected to the alleged constitutional violation alleged by Plaintiff for which he could be held individually liable for a § 1983 claim." *Id.* at 19.

Admittedly, the caption of the complaint in this case does not indicate what capacity Young was sued in. *See* Doc. 1. Although this failure would preclude the Court from assuming that Eustice had sued Young individually in a number of other circuits, the Fifth Circuit has held that "if it is not clear from allegations of the complaint whether a defendant has been sued in his official or individual capacity, the court must look to the substance of the claims, the relief sought, and the course of the proceedings to determine in which capacity the defendant is sued." *Senu-Oke v. Jackson State Univ.*, 521 F. Supp. 2d 551, 556 (S.D. Miss. 2007), *aff'd*, 283 Fed. App'x 236 (5th Cir. 2008) (collecting cases and discussing differences between Fifth Circuit and

other circuits' approach to a plaintiff's failure to expressly indicate in which capacity he sues a defendant.).

"To state personal-capacity claims under § 1983 plaintiffs must allege that while acting under color of state law defendants were personally involved in the deprivation of a right secured by the laws or Constitution of the United States, or that the defendants' wrongful actions were causally connected to such a deprivation." *A.W. v. Humble Indep. Sch. Dist.*, 25 F. Supp. 3d 973, 1003 (S.D. Tex. 2014), *aff'd sub nom. King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754 (5th Cir. 2015) (citing *James*, 535 F.3d at 373). "A supervisor is not personally liable for his subordinate's actions in which he had no involvement." *James*, 535 F.3d at 373 (citation omitted). In order to avoid this bar to vicarious liability, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated federal law. *Humble Indep. Sch. Dist.*, 25 F. Supp. 3d at 1003 (citing *Iqbal*, 556 U.S. at 677).

In this case, the only mention of Young is that he is the "President of A&M University." Doc. 1 ¶ 5. Importantly, there are absolutely no allegations that Young was involved in Eustice's case in any way. *See id.* Indeed, in his Response, Eustice notes that Young was not even the President of TAMU at the time of the first alleged cheating incident. *See* Doc. 13 at 7. ("Plaintiff knowing that he was in the right, went up the chain of command, went to Mr. Tim Powers' supervisor and eventually up to the then President of A&M, President Loftin who all turned him away."). Nevertheless, because Eustice seeks monetary relief and Defendants briefed the issue of Young's qualified immunity in their Motion to Dismiss, the Court will assume that Young was sued in his individual capacity. *See Senu-Oke*, 521 F. Supp. 2d at 557 ("what leads the court to conclude that plaintiff is proceeding against defendants individually is the nature of the relief sought, for plaintiff is suing under § 1983 only for monetary relief and . . . . such relief is only

available against the defendants individually."); *Forside v. Miss. State Univ.*, 101CV438-DD, 2002 WL 31992181, at *5 (N.D. Miss. Dec. 30, 2002) (court assumed defendants were sued in their individual capacity because defendants briefed the issue of qualified immunity).

### i. Qualified immunity

Defendants argue that to the extent that Eustice asserts claims against Young in his individual capacity, Young is entitled to qualified immunity. Doc. 8 at 17–18. Moreover, Defendants contend that Eustice received all the process that he was due with regard to the suspension. *Id.* at 19–24. They go on to assert that Eustice has no liberty interest in his reputation. *Id.* at 24–25. Finally, Defendants allege that Eustice's substantive due process claim must also fail because he fails to set forth any factual allegations linking Young to the alleged violation. *Id.* at 25–28. Again, Eustice fails to respond to Defendants' arguments except to conclusorily assert that he has adequately pled protected interests and violations of his right to both procedural and substantive due process. *See* Doc. 13.

Public officials sued in their personal capacities under Section 1983 may be shielded from suit by the doctrine of qualified immunity. *Humble Indep. Sch. Dist.*, 25 F. Supp. 3d at 1003. Under this doctrine, Government officials performing discretionary functions are protected from personal liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002) (per curiam) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). To determine whether an official is entitled to qualified immunity from a suit alleging a constitutional violation, courts conduct a familiar two-step inquiry. *Id.* The first inquiry is whether, considered in the light most favorable to the plaintiff, the plaintiff has alleged facts that, if proven, would establish that the official

violated the plaintiff's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Stotter v. Univ. of Tex.*, 508 F.3d 812, 823 (5th Cir. 2007). Next, we ask whether the right was clearly established. *See Saucier*, 533 U.S. at 201. Even if a constitutional right may have been violated, the official is entitled to qualified immunity unless the court finds that the official's conduct was objectively unreasonable in light of clearly established law at the time of the state actions at issue. *McClendon*, 305 F.3d at 327. For a right to be "clearly established" for purposes of qualified immunity, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). When qualified immunity is raised in a motion to dismiss, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for 'objective legal reasonableness.'" *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (quoting *Harlow*, 457 U.S. at 819).

### 1. Protected interests

The Supreme Court has "never addressed whether a university student has a protected liberty or property interest in post-high school education." *Pham v. Univ. of La.*, CV 16-00467, 2016 WL 3843591, at *4 (W.D. La. July 13, 2016). However, the Fifth Circuit has repeatedly assumed that students have some type of protected interest that must be appropriately safeguarded prior to expulsion. *See Shaboon v. Duncan*, 252 F.3d 722, 730 (5th Cir. 2001) (assuming, without deciding, that medical resident had protected interest in her position); *Davis v. Mann*, 882 F.2d 967, 973 (5th Cir. 1989) (assuming the existence of a liberty or property interest and holding that dental resident received adequate process under Fourteenth Amendment); *Dixon v. Ala. State Bd. of Ed.*, 294 F.2d 150, 157 (5th Cir. 1961) (holding that there must be some notice and hearing before student expulsion from state college or university because students had interest in their college education).

The courts have decided, however, that reputation alone is not a "liberty" or "property" interest sufficient to invoke due process protections. *Paul v. Davis*, 424 U.S. 693, 701 (1976). Rather, there must be a right or status previously recognized and subsequently altered or extinguished by state action for a plaintiff to invoke the procedural guarantees in the Due Process Clause of the Fourteenth Amendment. *Id.* at 710–11. Moreover, even in cases in which a plaintiff has a protectable interest in his reputation, the Supreme Court has indicated that there must some publicizing of the reasons for a dismissal in order to amount to a stigma infringing one's liberty. *See Bd. of Curators v. Horowitz*, 435 U.S. 78, 83 (1978) (noting that the Court "rejected the theory that the mere fact of dismissal, absent some publicizing of the reasons for the action, could amount to a stigma infringing one's liberty.")

### 2. *Procedural due process*

Procedural due process constrains governmental decisions that deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Because due process is flexible and calls for such procedural protections as the particular situation demands, the Supreme Court has held that in a public university setting, the level of procedural protection that students are due varies according to whether students are dismissed or suspended for disciplinary or academic reasons. *See Horowitz*, 435 U.S. at 86. When the dismissal is for disciplinary reasons, such as for academic dishonesty,[2] the Fourteenth Amendment requires that "the student be given oral or written notice of the charges against him

---

[2] In *Shaboon*, the court noted that a case dealing with academic dishonesty (i.e., cheating) was one of pure misconduct rather than an academic dismissal. 252 F.3d at 730.

and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss v. Lopez*, 419 U.S. 565, 581 (1975). In contrast, suspensions or dismissals for academic reasons "call[] for far less stringent procedural requirements." *Horowitz*, 435 U.S. at 86.

Initially, the Court is skeptical that Eustice has an actionable claim when his complaint clearly states that the ultimate outcome of TAMU's actions was simply a two-year suspension of his secondary education at TAMU rather than an expulsion.[3] He went on to complete his studies elsewhere, and—aside from his conclusory allegations that he has suffered lifetime economic damages by attending an institution of "lesser prestige"—he makes no allegation that the suspension was publicized in a way that had negative ramifications on him that would entitle him to a liberty interest in his reputation. Finally, he alleges no facts to indicate that Young was personally involved in his suspension in any way whatsoever.

Nevertheless, assuming arguendo, that Eustice did have a liberty or property interest and Young was somehow involved, he has been afforded with at least as much due process as

---

[3] Although the Supreme Court stated in *Goss* that "[s]tudents facing temporary suspension have interests qualifying for protection of the Due Process Clause," in deciding that an entitlement to education existed the Court relied heavily on a state statute that guaranteed education to students between five and twenty-one years of age. *Goss*, 419 U.S. at 573. In contrast, Eustice directs the Court to no authority for the proposition that he is entitled to a secondary education under state law, or that the costs he incurred in transferring to another institution and for tuition are entitlements under state law, and as noted before, courts have generally assumed, without actually deciding that secondary students have a protected interest in their education. *See* Fern L. Kletter, Annotation, *School's Violation of Student's Substantive Due Process Rights by Suspending or Expelling Student*, 90 A.L.R. 6th 235 (2013) ("whether a student who is subject to dismissal may maintain a cause of action for violation of his or her right to substantive due process on the basis of having a state-created property interest in receiving his or her education remains an open question. Courts generally assume that such a right exists for purposes of deciding whether the suspension or expulsion violated substantive due process.").

required under the Fourth Amendment. When a formal complaint of cheating was lodged against him, he was notified of the charge. The school conducted a hearing where Eustice was capable of calling witnesses, presenting evidence, and responding to the allegations against him. This is all that is necessary for a disciplinary suspension under the Due Process Clause, and Eustice fails to identify any other process which he was due and deprived of by Young. Young is therefore entitled to qualified immunity dismissing Eustice's Section 1983-based claim for denial of his right to procedural due process. *See Shah v. Univ. of Texas Sw. Med. Sch.*, 54 F. Supp. 3d 681, 694–95 (N.D. Tex. 2014) (dismissing individual-capacity claims when there were insufficient allegations to link individual defendants to the alleged deprivation of procedural due process and plaintiff had received "some meaningful notice and an opportunity to respond" prior to his dismissal).

### 3. *Substantive due process*

In addition to procedural due process, the Fourteenth Amendment also protects substantive due process rights. The substantive component of due process "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)) (internal quotation marks omitted). "In determining whether the government's action has been arbitrary in the constitutional sense, the Court asks whether the government action 'shocks the conscience.'" *Pham*, 2016 WL 3843591, at *6 (citing *Kinzie v. Dall. Cnty. Hosp. Dist.*, 239 F.Supp.2d 618, 628 (N.D. Tex. 2003)). "[O]nly the most egregious executive action can be said to be 'arbitrary in the constitutional sense.'" *Cnty. of Sacramento*, 523 U.S. at 834 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992).

Eustice's complaint states in conclusory manner that none of TAMU's procedures "meet

even the most rudimentary requirements of either procedural or substantive due process."[4] Doc. 1 ¶ 37. However, his complaint contains no allegations supporting his claims of substantive due process violations. *See* Doc. 1. He makes a conclusory allegation that a "welfare check" of his dorm room for firearms occurred as a "pretext for the harassment and retaliation by TAMU officials for the exercise of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution." *Id.* ¶ 27. He also conclusorily alleges that after his suspension he was forced out of the dormitory "in retaliation for Plaintiff's action of sitting in the reception room of the Academic Provost until she agreed to at least make an appointment for the future." *Id.* ¶ 33. Importantly, even assuming these actions could be considered to "shock the conscience," there is no mention of Young's role in either incident. *See id.* ¶¶ 27, 33. Otherwise, Eustice's allegations are directed entirely at the process employed by TAMU during the 2014 disciplinary proceedings against Eustice and, as already noted, indicate that TAMU and its administrators followed the school's disciplinary code. As a result, the Court concludes that the allegations of the complaint are inadequate to enable the court to draw the inference that Young's actions—indeed, if he took any at all—were "such a substantial departure from accepted norms as to demonstrate that he did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225.

### c.  ADA and RA Section 504 claims

Eustice brings his Count-Two claims under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the ADA, 42 U.S.C. §§ 12131–150. Defendants urge this Court to dismiss Eustice's ADA claim under Rule 12(b)(1) because TAMU has sovereign immunity. Doc.

---

[4] This paragraph actually references "UTMB"—a common acronym for the University of Texas Medical Branch—but the Court assumes this was a typo and Eustice intended to refer to "TAMU."

8 at 30–33. With regard to Eustice's RA claim Defendants take a different tack and request

dismissal under 12(b)(6) because:

> Plaintiff fails to provide any further specifics anywhere in his Complaint,
> including when he made the accommodation request, to whom he made the
> request, the nature of the requested "accommodations for testing" or how any
> alleged failure to accommodate had any bearing or relevance on the academic
> misconduct charges brought against him that resulted in his suspension from
> TAMU.

*Id.* at 33. Defendants specifically argue that the claim fails because Eustice fails to allege

that (1) his ADHD made him disabled, (2) there is a causal connection between his ADHD and

the academic misconduct issues that resulted in his suspension, and (3) he was discriminated

against *solely* on the basis of his disability. *Id.* at 33–35. Eustice fails to respond to Defendants'

arguments regarding his RA and ADA claims. *See* Doc. 13.

The RA and ADA both prohibit discrimination against qualified individuals with

disabilities; they employ many of the same legal standards and offer the same remedies. *Kemp v.*

*Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (per curiam) (citing *Delano–Pyle v. Victoria Cnty.*,

302 F.3d 567, 574 (5th Cir. 2002)); *see also* 29 U.S.C. § 794(d) (incorporating various ADA

standards into Section 504); 42 U.S.C. § 12133 (incorporating Section 504's remedies into Title

II of the ADA). Title II of the ADA prohibits discrimination on the basis of disability by any

"public entity," defined as a state or local government, any "department, agency, special purpose

district, or other instrumentality of a State or States or local government," or the National

Railroad Passenger Corporation. 42 U.S.C. §§ 12131(1), 12132. Similarly, the RA provides that

a qualified individual with a disability will not "be excluded from the participation in, be denied

the benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance." 29 U.S.C. § 794(a).

In light of this language, courts have concluded that individuals sued only in their

individual capacities cannot be considered proper defendants under either Title II of the ADA or the RA. *See, e.g.*, *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) ("public entity" as defined in Title II of the ADA does not include individuals); *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) (collecting cases and noting that defendants may not be sued in their individual capacities under Title II of the ADA or under Section 504 of the RA); *Lollar v. Baker*, 196 F.3d 603, 608–09 (5th Cir. 1999) (suit under the RA not permitted against government official sued in individual capacity); *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) ("[A] plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in her individual capacity to vindicate rights created by Title II of the ADA."). *See also, e.g.*, *Slocum v. Livingston*, CIV.A. H-11-486, 2012 WL 2088953, at *14 n.11 (S.D. Tex. June 8, 2012) (collecting cases); *Barkwell v. Rich*, 1:09-CV-1019, 2012 WL 3683557, at *5 n.2 (E.D. Tex. July 20, 2012), *report and recommendation adopted*, 1:09-CV-1019, 2012 WL 3656247 (E.D. Tex. Aug. 24, 2012); *K.G.S. v. Kemp*, 4:11-CV-303-A, 2011 WL 4635002, at *4 (N.D. Tex. Oct. 5, 2011).

"To establish a claim under either statute 'in the context of a student excluded from an educational program,' a plaintiff must prove that: '(1) she has a disability; (2) she is otherwise qualified to participate in the defendant's program; and (3) she was excluded from the program on the basis of [her] disability.'" *Maples v. Univ. of Tex. Med. Branch at Galveston*, 901 F. Supp. 2d 874, 879 (S.D. Tex. 2012), *aff'd*, 524 Fed. App'x 93 (5th Cir. 2013) (per curiam) (unpublished) (quoting *Halpern v. Wake Forest Univ. Health Servs.*, 669 F.3d 454, 461 (4th Cir. 2012)). The only difference between the ADA and RA in the application of these elements concerns the final requirement. Under Section 504 of the RA, "[n]o otherwise qualified individual with a disability . . . shall, *solely* by reason of her or his disability, be excluded from

the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (emphasis added). The standard in Title II of the ADA more broadly prohibits exclusion "by reason of [a] disability." *Compare* 42 U.S.C. § 12132, *with* 29 U.S.C. § 794(a). Thus, while Section 504 establishes a "sole cause" test for causation, the ADA instead establishes a "motivating factor" test. *Pinkerton v. Spellings*, 529 F.3d 513, 516–19 (5th Cir. 2008) (per curiam); *see also Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503–04 (5th Cir. 2002).

The Fifth Circuit has held that the state's receipt of federal funds is a knowing and voluntary waiver of its sovereign immunity as to claims arising under Section 504 of the RA. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287 (5th Cir. 2005). Whether the state has waived its sovereign immunity to suit under the ADA, however, is less clear. The Supreme Court has narrowly cabined its holdings in this area, stating that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia*, 546 U.S. 151, 159 (2006); *accord Tennessee v. Lane*, 541 U.S. 509, 522, 533 (2004). Since this pronouncement, neither of our senior courts has addressed whether Title II validly abrogates sovereign immunity to the extent that it implicates access to education or freedom from disability discrimination in education. *See Pace*, 403 F.3d at 287.[5] Accordingly, some district courts within

---

[5] In fact, the Fifth Circuit has deliberately avoided this question:

> Alternatively, Pace asks this en banc court to rule that Congress—acting under § 5 of the Fourteenth Amendment—in fact abrogated Louisiana's Eleventh Amendment immunity, leaving Louisiana subject to suit on Pace's ADA, Rehabilitation Act, and IDEA claims. As we hold that Louisiana waived its Eleventh Amendment immunity with respect to the Rehabilitation Act and the IDEA, it is not necessary for us to address Pace's contention that Louisiana's immunity to suit under those statutes was also abrogated. Neither is it necessary

our circuit have assumed that state educational entities enjoy sovereign immunity with regard to the ADA, *see, e.g.*, *Hall v. Bd. of Supervisors of Cmty. & Tech. Colleges*, CIV.A. 15-67, 2015 WL 2383744, at *3–4 (E.D. La. May 18, 2015).[6] Others, however, have expressly avoided addressing whether—and to what extent—Title II of the ADA waives the sovereign immunity of state entities. *See, e.g.*, *Wije v. Tex. Woman's Univ.*, 4:14-CV-571-ALM-CAN, 2015 WL 9872534, at *7 (E.D. Tex. Dec. 22, 2015), *report and recommendation adopted*, 4:14-CV-571, 2016 WL 231151 (E.D. Tex. Jan. 19, 2016) ("Plaintiff further contends that . . . Title II of the Americans with Disabilities Act . . . waive[s] the immunity of the United States . . . . While certain of these statutes do contain limited waivers of immunity for various entities/agencies, Plaintiff has failed to plead applicable causes of action or factual allegations that would trigger the application of such statutes to this case."); *Cooper v. Kliebert*, CIV.A. 14-507-SDDSCR, 2014 WL 7334911, at *4 (M.D. La. Dec. 19, 2014) ("Since Louisiana has validly waived its sovereign immunity from actions under § 504 of the RA, whether or not Congress has

---

for us to consider whether Title II of the ADA abrogates Eleventh Amendment immunity in this case. First, the Supreme Court, in *Tennessee v. Lane*, held that Title II abrogates sovereign immunity to the extent that it implicates the accessibility of judicial services, but refused to consider its application to other rights, including those considered to be fundamental under the Constitution. Because (1) the Supreme Court has never before recognized access to public education or freedom from disability discrimination in education to be fundamental rights, and (2) it is unnecessary to address Pace's Title II claims given that its rights and remedies are identical to and duplicative of those provided in § 504, we do not address whether the holding in *Lane* extends to disability discrimination in access to public education.

*Pace*, 403 F.3d at 287 (citations omitted).

[6] It is worth noting that the case upon which the *Hall* court relied to conclude that the Fifth Circuit had held that Congress had not validly abrogated the states' Eleventh Amendment immunity in enacting Title II of the ADA, *Reickenbacker v. Foster*, 274 F.3d 974, 978 (5th Cir. 2001), was overruled by *Pace*, in which the Court specifically declined to address ADA abrogation of sovereign immunity in the context of access to and disability discrimination in education. *See supra* note 3.

constitutionally abrogated state sovereignty under Title II of the ADA under the circumstances in this case need not be reached. The Court shall ha[ve] jurisdiction over Plaintiffs' claims arising § 504 of the RA, which for all intents and purposes is identical to the plaintiffs' claims under Title II of the R.A."); *Mire v. Bd. of Supervisors*, CV 15-6965, 2016 WL 4761561, at *4 (E.D. La. Sept. 13, 2016) ("The Court, as noted, finds that the LSU Board's motion to dismiss does not address Mire's Title II claims, and it therefore does not reach the issue of whether those claims are, like her Title I claims, barred by the Eleventh Amendment.").

Like a number of our sister districts, the Court declines to address this issue because resolution of the case at bar does not require it. This is because, as with his RA claim—which is not barred by sovereign immunity—plaintiff has alleged no facts that would support an ADA claim against Defendants.

With regard to his RA claim, even assuming arguendo that Eustice could meet the other essential elements, the claim fails because he does not plausibly allege that he was discriminated against *solely* by reason of his disability. Indeed, the allegations of his complaint directly undermine his RA charge by asserting that his suspension and the supposedly retaliatory acts of TAMU and its officials were motivated, at least in part, by other considerations. He alleges that his first failing grade was due to Dr. Kim's suspicion that Eustice cheated because his exam "looked different from the other exams." Doc. 1 ¶ 9. Eustice goes on to state that his suspension hearing was ultimately precipitated by Dr. Maggard's allegations of plagiarism against him, and he was harassed and forced out of the dorms because of his actions in seeking redress for the school's actions. *Id.* ¶¶ 19, 23, 27, 30, 33. These allegations are insufficient to survive Defendants' Motion to Dismiss. Accordingly, Eustice's RA claims are dismissed.

Likewise, Eustice's allegations fail to state a claim under the ADA. Nowhere in his

complaint does Eustice allege that he was excluded from TAMU on the basis of his ADHD.

Although he states that a testing accommodation was requested and denied, this is insufficient to

satisfy the third element of an ADA claim because the failing exam grade was not the basis of

the suspension—as his complaint admits. *See* Doc. 1. Indeed, nowhere does Eustice allege how

his ADHD was related to the suspension decision at all—let alone the basis for it. In fact, there

are absolutely no allegations to suggest the plagiarism charge that led to his suspension hearing

had anything to do with his ADHD. This dooms Eustice's complaint, albeit on a different ground

than that advanced by Defendants. Moreover, to the extent that Eustice is advancing any

individual-capacity claims against Young under the ADA or RA, such claims are barred by the

language of the statutes.

### d. State-law defamation claim

Eustice's third—and only remaining—cause of action is for "damage to reputation," Doc.

1 ¶¶ 47–51, which is appropriately characterized as a state-law intentional tort. *See Reed v.*

*Gonzalez*, CIV. A. 499CV603P, 2001 WL 640788, at *6 (N.D. Tex. June 8, 2001); *Aviles v.*

*United States*, 696 F. Supp. 217, 218 (E.D. La. 1988).

Under 28 U.S.C. § 1367(c), district courts may decline to exercise supplemental

jurisdiction over a claim if: "(1) the claim raises a novel or complex issue of state law, (2) the

claim substantially predominates over the claim or claims over which the district court has

original jurisdiction, (3) the district court has dismissed all claims over which it has original

jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining

jurisdiction." The rule that a court may decline to exercise supplemental jurisdiction is only

tempered by a consideration of the amount of resources expended at the time of dismissal. *See*

*Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009) ("Our

case law is clear that when a district court declines to exercise jurisdiction over remaining state law claims following the dismissal of all federal-law claims and remands a suit after investing a significant amount of judicial resources in the litigation analogous to that invested by the district court in this case, that court has abused its discretion under 28 U.S.C. § 1367."). Thus, having dismissed all of Eustice's federal claims at this early stage of the litigation, the Court may dismiss his state-law claim without further ado. *See Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992) ("Our general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed."). However, doing so would mean that the Court would not reach the merits of the parties' arguments. Therefore, a dismissal of Eustice's state-law claims would be without prejudice, and he would be free to bring those claims in state court. *See Flaming v. Univ. of Tex. Med. Branch*, CV H-15-2222, 2016 WL 727941, at *11 (S.D. Tex. Feb. 24, 2016) ( "[T]he 'general rule' is to dismiss any pendent state law claims without prejudice so that the plaintiff may re-file his claims in the appropriate state court.").

Rather than asking us to decline jurisdiction over Eustice's defamation claim under Section 1367, Defendants urge us to simply dispose of it under Rule 12(b)(1) because "it is without dispute" that TAMU is entitled to sovereign immunity as an arm of the state. Doc. 8 at 32. Eustice fails to respond to Defendants. *See* Doc. 13. In the interest of efficiency and to prevent needless repeat litigation, the Court accepts Defendants' invitation to address the single remaining state-law claim.

"Under the doctrine of sovereign immunity, the state is not liable for the negligence of its employees absent constitutional or statutory provision for liability." *Univ. of Tex. Med. Branch v. York*, 871 S.W.2d 175, 177 (Tex. 1994) (citing *Lowe v. Tex. Tech Univ.*, 540 S.W.2d 297, 298

(Tex. 1976)). In 1969, the Texas Legislature enacted the Texas Tort Claims Act ("TTCA") to waive governmental immunity in certain specifically enumerated circumstances. Tort Claims Act, 61st Leg., R.S., ch. 292, 1969 Tex. Gen. Laws 874. Thus, the TTCA does not abolish the doctrine of sovereign immunity entirely. *York*, 871 S.W.2d at 177. Rather, it "waives governmental immunity in three general areas: use of publicly owned vehicles, premises defects, and injuries arising from conditions or use of property." *City of Hempstead v. Kmiec*, 902 S.W.2d 118, 122 (Tex. App.—Houston [1st Dist.] 1995, no writ) (citing Tex. Civ. Prac. & Rem. Code § 101.021; *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 31 (Tex. 1983)). Importantly, it does not waive immunity for intentional torts such as defamation. *Wagner v. Tex. A & M Univ.*, 939 F. Supp. 1297, 1328 (S.D. Tex. 1996) (citing *Kmiec*, 902 S.W.2d at 122 (citing Tex. Civ. Prac. & Rem. Code Ann. § 101.057(2))); *Jackson v. Tex. A&M Univ.*, 975 F. Supp. 943, 946 (S.D. Tex. 1996).

Moreover, under Texas law, a suit against a state officer in his official capacity is a suit against the state. *Liberty Mut. Ins. Co. v. Sharp*, 874 S.W.2d 736, 737 (Tex. App.—Austin 1994, writ denied) (citing *Pickell v. Brooks*, 846 S.W.2d 421, 425 (Tex. App.—Austin 1992, writ denied)). Accordingly, officials acting in their official capacity enjoy the same immunity as the state itself. *Bowles v. Reed*, 913 S.W.2d 652, 655 (Tex. App.—Waco 1995, writ denied); *Dear v. City of Irving*, 902 S.W.2d 731, 735 (Tex. App.—Austin 1995, writ denied). This is the case even if the plaintiff is seeking injunctive relief under *Ex Parte Young*. *See Earles v. State Bd. of Certified Pub. Accountants*, 139 F.3d 1033, 1039 (5th Cir. 1998) ("plaintiffs' state-law claims [against individuals in their official capacity], however, are not cognizable in a proceeding under *Ex parte Young* because state officials continue to be immunized from suit in federal court on alleged violations of state law brought under the federal courts' supplemental jurisdiction.").

In light of these well-established principles, both TAMU and Young in his official capacity enjoy sovereign immunity against Eustice's state-law defamation claim. This is the case even though Eustice purportedly seeks injunctive relief. Accordingly, Eustice's state-law claims against TAMU and Young in his official capacity are dismissed with prejudice. To the extent that Eustice asserts his defamation claim against Young in his individual capacity the Court is of the opinion that those claims must also fail under Rule 12(b)(6). As already mentioned a number of times throughout this opinion, Eustice's complaint contains absolutely no allegations about Young's individual conduct or how it is connected to Eustice's alleged injury.

### e. Amendment

Eustice does not request leave to amend in his response to Defendants' Motion to Dismiss. *See* Doc. 13. Nevertheless, Federal Rule of Civil Procedure 15(a) states that "[t]he court should freely give leave [to amend] when justice so requires." The Fifth Circuit has held that Rule 15(a) "evinces a bias in favor of granting leave to amend." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (5th Cir. 1981). "However, it is by no means automatic." *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. Unit A July 1981) (citing *Layfield v. Bill Heard Chevrolet Co.*, 607 F.2d 1097, 1099 (5th Cir. 1979) (per curiam)). "A decision to grant leave is within the discretion of the court, although if the court lacks a substantial reason to deny leave, its discretion is not broad enough to permit denial." *Louisiana v. Litton Mortg. Co.*, 50 F.3d 1298, 1302–03 (5th Cir. 1995) (per curiam) (citation and internal quotation marks omitted). In exercising its discretion, "the district court may consider such factors as 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment.'" *Whitaker v. City of Houston*, 963 F.2d 831, 836 (5th Cir. 1992) (quoting *Foman v.*

*Davis*, 371 U.S. 178, 182 (1962)).

Notably, in this circuit, "plaintiffs are not entitled to an opportunity to satisfy the pleading requirements for governmental liability when, in response to a motion to dismiss, the plaintiffs simply declare the adequacy of their complaint and fail to take advantage of the opportunity to amend as a matter of right." *Humble Indep. Sch. Dist.*, 25 F. Supp. 3d at 1008–09 (citing *Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997); *Babb v. Dorman*, 33 F.3d 472, 479 (5th Cir. 1994)). In this case, Eustice makes no attempt to respond to Defendants' motion with an amended complaint, choosing instead to parrot the allegations from his Original Complaint and conclusorily assert that his claims are sufficient to withstand Defendants' attack. *See* Doc. 13. Moreover, the Court concludes that granting Eustice leave to amend would be futile. Accordingly, the Court declines to grant Eustice leave to amend.

### IV. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion to Dismiss is **GRANTED**. Plaintiff's claims against both Defendants are **DISMISSED WITH PREJUDICE**.

SIGNED at Houston, Texas, this 30th day of September, 2016.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE